1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 PATRICIA BARBOUR, | CASE NO. 09cv2724-WQH-WVG |
| 12                            Plaintiff, | ORDER |
|         vs. | |
| 13 UNUM LIFE INSURANCE COMPANY OF AMERICA, a Delaware corporation; | |
| 14 PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, a Tennessee | |
| 15 corporation, and DOES 1-20, inclusive, | |
| 16                            Defendants. | |

17   HAYES, Judge:

18        The matter before the Court is the Motion for Partial Summary Judgment, filed by

19   Defendants Unum Life Insurance Company of America and Provident Life and Accident

20   Insurance Company.  ECF No. 23.

21   **I.      Background**

22        On October 26, 2009, Plaintiff Patricia Barbour initiated this action by filing a

23   Complaint against Defendants in San Diego County Superior Court.  ECF No. 1, Ex. A.  In

24   connection with Defendants' denial of benefits under a disability insurance policy, Plaintiff

25   asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, and

26   intentional infliction of emotional distress.  Plaintiff seeks punitive damages as to the latter two

27   claims.

28        On December 4, 2009, Defendants removed the action to this Court, alleging diversity

                                            - 1 -                          09cv2724-WQH-WVG

jurisdiction.[1]  ECF No. 1.

On February 25, 2011, Defendants filed the Motion for Partial Summary Judgment, accompanied by evidence.  ECF No. 23.  Defendants seek partial summary judgment as to Plaintiff's claims for breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress.  In the alternative, Defendants seek partial summary judgment as to Plaintiff's request for punitive damages.

On May 2, 2011, Plaintiff filed an opposition to the motion, accompanied by evidence. ECF No. 26.

On May 9, 2011, Defendants filed a reply in support of the motion, accompanied by evidence and objections to the evidence submitted by Plaintiff.  ECF No. 27.

On May 31, 2011, Plaintiff filed a surreply, accompanied by evidence and a response to Defendants' evidentiary objections.  ECF Nos. 29, 30.

On June 17, 2011, Defendants filed a response to Plaintiff's surreply, accompanied by objections to the evidence submitted by Plaintiff on surreply.  ECF Nos. 35, 36.

On August 4, 2011, the Court conducted oral argument on the Motion for Partial Summary Judgment.  ECF No. 38.

**II.    Facts**

Defendants issued a Group Salary Protection Insurance Policy ("Policy") to eligible employees of the Bonsall Union School District, effective September 1, 1991.  Diegel Decl. ¶ 3, ECF No. 23-2.  Plaintiff was employed by the Bonsall Union School District in the position of Principal effective August 19, 2002, and Plaintiff became covered under the Policy effective September 1, 2002.  *Id.*; Diegel Decl., Ex. 2 at 1, ECF No. 23-2.  The Policy provides Accident and Sickness Disability Benefits for one year in the event of total disability; after one year, the Policy provides monthly Long Term Disability Income Benefits for as long as the claimant remains totally disabled and otherwise qualifies for benefits, up to the claimant's 65th birthday.  Diegel Decl., Ex. 1 at 4-5, 14, ECF No. 23-2.  Under the Policy, during the first two

---

[1] Defendants are alleged to be related entities.  For the purposes of this Order, the Court does not distinguish between the Defendants.

benefit years, "Total Disability" is defined as the inability "to perform the material duties of your own occupation." *Id*. at 25. After the first two benefit years, "Total Disability" is defined as the inability "to engage in any gainful occupation for which you are reasonably qualified by training, education or experience." *Id*.

On February 5, 2003, Plaintiff submitted a claim for benefits under the Policy, claiming disability as a result of "severe right quadrant abdominal pain – inflammation small intestines." Diegel Decl., Ex. 2 at 1, ECF No. 23-2. Plaintiff reported that she stopped working on January 6, 2003, when she was hospitalized for two weeks. *Id*. Plaintiff's claim contained a physician's statement from Dr. Jeffrey Yusim, who stated that Plaintiff was diagnosed with "abdominal pain inflammation," and stated that Plaintiff "has severe abdominal-pelvic pain." *Id*. at 2. In January 2003 and February 2003, hernia surgeries were performed on Plaintiff. Diegel Decl., Ex. 7 at 1, ECF No. 23-2.

In February 2003, Defendants began paying Plaintiff disability benefits pursuant to the Policy. Diegel Decl., Ex. 8 at 1, ECF No. 23-2.

On July 3, 2003, Plaintiff submitted a statement to Defendants indicating that she is restricted from driving, walking/standing and sitting for extended periods. Diegel Decl., Ex. 3 at 1, ECF No. 23-2. On July 16, 2003, Dr. Melissa Hurd, Plaintiff's physician, submitted a statement indicating that Plaintiff underwent hernia surgery on April 16, 2003, and Plaintiff was presently able to tolerate standing for 30 minutes, sitting for one hour, walking one block, and no lifting or carrying. Diegel Decl., Ex. 4 at 1, ECF No. 23-2. Dr. Hurd indicated that "workup remains in progress," and Plaintiff was not totally disabled from performing her occupation. *Id*.

On November 17, 2003, Plaintiff submitted a statement to Defendants indicating that she "can no longer stand, sit, or walk," due to "complication from ... hernia surgery." Diegel Decl., Ex. 5 at 1, ECF No. 23-2. On November 19, 2003, Dr. Hurd submitted a statement indicating that Plaintiff is "currently unable to stand, sit, walk or drive," and is totally disabled from performing her occupation or any other occupation. Diegel Decl., Ex. 6 at 1, ECF No. 23-2.

On February 10, 2004, Plaintiff submitted medical information to Defendants, including an August 13, 2003 MRI report which revealed an "irregular lesion," and records related to Plaintiff's hospitalization from December 8, 2003 through December 31, 2003. Pl. Ex. 2 at 2489, 2495, ECF No. 26-3. In a report dated February 2, 2004, Plaintiff's treating physician, Dr. David Smith, diagnosed Plaintiff with a "[n]euroma, right genitofemoral nerve." Diegel Decl., Ex. 7 at 5, ECF No. 23-2. Dr. Smith stated that in August 2003, an ilioinguinal nerve block was performed on Plaintiff but it "was ineffective," and in October 2003, another ilioinguinal nerve block was performed but it "caused increased pain." *Id.* at 1. Dr. Smith stated that Plaintiff takes three to six 2mg tablets per day of Dilaudid, which "provides adequate pain relief with minimal side effects." *Id.* at 5. Dr. Smith recommended that Plaintiff first undergo physical therapy, and "[i]f the physical therapy is not effective, then surgical explantation of the neuroma." *Id.* Dr. Smith stated that, "as a last resort," Plaintiff could undergo "a spinal cord stimulator trial in order to relieve [Plaintiff] of her persistent discomfort." *Id.*

On March 3, 2004, Defendants informed Plaintiff that she had received her final benefit check for Disability Income Benefits, and she was now eligible for long-term disability benefits pursuant to the Policy. Diegel Decl., Ex. 8 at 1, ECF No. 23-2.

From 2004 through 2007, Plaintiff submitted medical records and statements, and Defendants continued paying benefits pursuant to the Policy. *See generally*, Pl. Ex. 2, ECF No. 26-2 to 26-5. Among the records submitted by Plaintiff is a September 16, 2003 report from Dr. R. Lee Wagner, who stated that Plaintiff "will require significant intervention by treating physicians to get a handle on this problem and get her back to work. It is going to be a challenging problem...." Pl. Ex. 2 at 2519, ECF No. 26-3. The records reflect that between 2003 and 2005, Plaintiff underwent four "nerve block" procedures, and multiple operative procedures. *Id.* at 2531, 2559, 2622, 2632, 2669, 2936, 2942, 3088, ECF No. 26-3 to 26-4. On April 3, 2006, Plaintiff underwent a "right inguinal exploration" and "removal of hernia plug and excision of frayed genitofemoral nerve," performed by three surgeons. *Id.* at 2949-50, ECF No. 26-4. On June 23, 2006, Dr. Mark Talamini advised Plaintiff that "chronic pain"

such as that reported by Plaintiff was a "rare but known complication of hernia surgery," and "sometimes this pain never goes away." *Id*. at 2948. In 2007, Plaintiff was taking nine 4mg tablets of Dilaudid per day. *Id*. at 2853. On August 17, 2007, Plaintiff underwent a surgical procedure to install a "Precision Bionics epidural stimulator." *Id*. at 2898. On August 21, 2007, after the spinal cord stimulator trial, Plaintiff reported that there was a 50% reduction in pain, and that "she was able to walk her dog comfortably but was unable to bend, twist or turn." *Id*. 2845.

On October 4, 2007, Defendants' representative Sonya Brewer spoke with Plaintiff. *Id*. at 2807. Plaintiff stated that "she uses a cane due to right groin and leg pain," "she can't stretch bend or stoop," "she can't sit for very long," she "can't drive" or do "house chores," but she can "[g]o for small walks [with] her dog." *Id*. at 2807, 2809.

In November 2007, Dr. Smith provided Defendants with the following restrictions and limitations for Plaintiff: "She could occasionally twist, bend, stoop and reach above shoulder level. She could occasionally lift up to 20 [pounds] and occasionally do hand/eye coordinated [movements]. She is unable to drive, sit/stand for long periods." Diegel Decl., Ex. 19 at 2, ECF No. 23-2.

On December 5, 2007, Brewer requested three days of surveillance be performed on Plaintiff. Pl. Ex. 2 at 3159, ECF No. 26-4. In the request, Brewer stated: "Please observe the claimant's daily activities as they pertain to her [restrictions and limitations]. [Plaintiff] states that she uses a cane and her mother does everything for her. She is 5'2 142 lbs." *Id*.

Defendants' investigator conducted the requested surveillance on December 10-12, 2007. *Id*. at 2701. The investigator's report states:

> A female subject believed to be the insured and hereinafter referred to as such was observed as she departed her believed residence in a 2001 Honda CR-V ..., drove to a UPS store and a Vons grocery store, and then returned to the residence. During this time, the insured was observed as she walked around, entered and exited her vehicle, ... removed a box from [a shopping] cart, bent at the waist to place the box in her vehicle, stepped on and off the curb, and raised her arms. The insured moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction. No visible braces, supports or orthopedic devices were observed.

*Id*. The report includes a photo of the "female subject believed to be the insured," and

indicates that she was "5 ft 2 in" and "160lbs." *Id.* at 2702. The investigator indicates that he obtained video of the "female subject believed to be the insured" during the surveillance. *Id.* at 2701.

It is undisputed that the "female subject believed to be the insured," who was observed during the December 2007 surveillance, was the Plaintiff's mother, not the Plaintiff.

On July 10, 2008, Dr. Smith submitted a statement to Defendants indicating that he examined Plaintiff on that date, and Plaintiff's restrictions were "lifting, pushing, pulling, bending, standing, walking, driving," and Plaintiff's limitations were "unable to drive, sit/stand for long periods," and Plaintiff was only "occasionally" able to lift up to ten pounds. *Id.* at 3378. Dr. Smith indicated that Plaintiff was able to sit, stand and walk less than one hour "per workday." *Id.*

On July 21, 2008, Defendants' representative Beth Stoker wrote in Plaintiff's file that "[s]ince [Plaintiff] was active at last surveillance in 12/07, further surveillance may be warranted." *Id.* at 2767.

On October 7, 2008, Defendants' representative Richard Gaume conducted a "field visit" with Plaintiff at Plaintiff's residence. Diegel Decl., Ex. 21 at 80, ECF No. 23-2. Gaume stated in his report of the visit:

> [Plaintiff] maintains that she remains totally disabled due to the restrictions and limitations that she characterized for me during this interview. In part this includes a reported limited sitting ability, and inability to stand up without a cane, and a very limited standing ability with a cane.

> [Plaintiff]'s characterization of her restrictions and limitations during this interview did not seem consistent with her unrehearsed activities that were observed in December, 2007....

> [D]uring this interview, [Plaintiff] reported very limited daily activities, which included only leaving the home a couple of times a month for reasons other than medical appointments. The reported daily activities during this interview also did not seem consistent with the claimant's observed activities in December, 2007, when she left the residence on two days in a three-day period.

*Id.* at 80-81. Gaume stated that he took a photograph of Plaintiff, and forwarded the photo via e-mail to Defendants' "Disability Benefit Specialist" handling Plaintiff's case. *Id.* at 86.

On December 18, 2008, Plaintiff sent Defendants 115 pages of updated medical files. Pl. Ex. 2 at 2766, ECF No. 26-3.

On January 7, 2009, Stoker wrote in Plaintiff's file, "[d]ue to inconsistencies in the 12/07 surveillance, 10/08 field visit findings and chronic pain requiring Diluadid and a pain stimulator, recommend repeating surveillance to confirm her ongoing level of impairment." *Id.*

Defendants' investigator conducted the requested surveillance on January 14-15, 2007. *Id.* at 2717. The investigator's report states that on January 14:

> The claimant was observed exiting the residence with a dog holding a dog leash and a cane in her right hand switching the cane to and from both hands interacting with an elder female subject believed to be her mother and an unknown female neighbor walking short distances bending forward leaning and twisting from side to side lifting the dog slightly and ascending a flight of stairs. The claimant moved in a smooth fluid manner without exhibiting external signs of impairment or physical restriction. No visible braces were observed however the claimant was observed utilizing a cane with minimal dependancy. Total video obtained 11 minutes and 12 seconds.

*Id.* The investigator's report states that, on January 15, Plaintiff was not observed leaving the residence at any time, although Plaintiff's "mother was observed walking the dog around the condo complex." *Id.*

On February 9, 2009, Defendants' in-house consultant, Dr. Sabrina Hammond, reviewed the file and prepared a report. Diegel Decl., Ex. 30, ECF No. 23-2. Dr. Hammond stated that Plaintiff's restrictions and limitations set by Dr. Smith were "not supported." *Id.* at 121. Dr. Hammond stated:

> The medical records document the insured's chronic medical condition and her treatments, however there are inconsistencies in the insured's reported level of impairment and information noted during the [field] visit and two surveillance periods.
>
> The insured reports to her physicians that she requires a cane for ambulation, however both surveillance periods did not support this. She stated during the field visit that she needed a cane just to stand up. It is noted during the 12/07 surveillance that the insured ambulated without a cane. She was observed driving, grocery shopping, lifting items and ambulating without any assistive devices. The 1/09 surveillance noted many body movements that the insured was reported not to be able to perform (bending, twisting, walking unassisted). Although she did have a cane while ambulating in the 1/09 surveillance, the cane was used minimally and mostly carried around. The insured reported that she cannot even carry a couple of pounds, yet she bent from the waist and picked up her dog with one hand.

*Id.* at 121-22. Dr. Hammond concluded that Plaintiff "has full time sedentary capacity." *Id.* at 122.

On March 11, 2009, Defendants' "Designated Medical Officer," Dr. Suzanne Benson, reviewed the file and stated:

> The [Attending Physician] supports claimant [having] physical capabilities that would preclude full-time sedentary work such as zero hours of sitting per workday. File information did not reasonably support a diagnosis that would limit the claimant's physical capability to that degree. Of note, during 2007 and 2009 surveillance, the monitored individual showed activities that exceeded what the [Attending Physician] reported the claimant could do in Attending Physician Statements. As per [Dr. Hammond], file information was insufficient to reasonably support a condition that would preclude full-time sedentary job duties.

Diegel Decl., Ex. 33 at 137, ECF No. 23-2.

On March 18, 2009, Defendants' vocational rehabilitation consultant identified three occupations at the sedentary physical demand level which were consistent with Plaintiff's age, education, training and experience: Education Specialist, Financial Aid Counselor, and Educational Counselor. Diegel Decl., Ex. 34 at 141, ECF No. 23-2.

On March 25, 2009, Stoker wrote to Plaintiff and stated that Defendants are "unable to continue benefits." Diegel Decl., Ex. 36 at 145, ECF No. 23-2. Stoker stated that "[b]ased on the information in our file, we have concluded that there are gainful occupations you are capable of performing." *Id.* Stoker stated that Defendants' "on-site physician" and "Designated Medical Officer" agreed that Plaintiff "would have full-time sedentary work capacity." *Id.* at 146. Stoker stated:

> [D]ocumentation of your activities was completed on two separate occasions, December 10 through December 12, 2007 and January 14 and January 15, 2009. On both occasions, you were observed performing activities that are outside of the restrictions and limitations provided by your attending physician in that you have been documented driving, pushing and pulling a grocery cart, stooping, bending, walking and lifting.

*Id.* Stoker stated: "If you dispute this determination, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on review." *Id.* at 148.

Defendants discontinued paying Plaintiff benefits pursuant to the Policy effective March 31, 2009. Diegel Decl. ¶ 45, ECF No. 23-2.

On September 18, 2009, Plaintiff's attorney, Brian Soriano, wrote Stoker a letter. Pl. Ex. 2 at 3756, ECF No. 26-5. Soriano stated that Stoker's "termination letter erroneously

informs [Plaintiff] that any potential claim she may have for the termination of her benefits is governed by the Employee Retirement Income Security Act." *Id*.  Soriano included a letter from Dr. Smith stating that the photo of the "female subject believed to be the insured" on the December 2007 surveillance report was not a photo of Plaintiff.  *Id*. at 3770.  Soriano also included a functional capacity evaluation of Plaintiff completed on May 19, 2009 by physical therapist James Ward.  *Id*. at 3759.  In the report of the functional capacity evaluation, Ward stated that Plaintiff's "patterns of movement and physiological responses [were] consistent with maximal effort," Plaintiff's "[f]unctional limitations noted are consistent with physical impairments and diagnosis," and Plaintiff's "[p]hysical limitations present a barrier to work." *Id*. at 3760.

On September 30, 2009, Dr. Hammond reviewed the May 19, 2009 functional capacity evaluation and concluded that "[r]eview of the [functional capacity evaluation] does not change [her] previous ... opinion."  *Id*. at 3774.

On October 1, 2009, Dr. Benson reviewed the functional capacity evaluation and concluded that she "concur[red] with [Dr. Hammond's] opinion."  *Id*. at 3794.  Dr. Benson stated that "there is no [functional capacity evaluation] test that can determine whether a client gives maximal effort."  *Id*. at 3793.  Dr. Benson acknowledged that "[t]he claimant reports that the monitored individual in 2007 surveillance was not her," but Dr. Benson stated that the new information provided by Plaintiff "did not change [her] previous opinion."  *Id*. at 3794.

On October 6, 2009, Defendants sent Plaintiff's counsel a letter stating that "you are correct that this policy is not covered by ERISA," and "the new information submitted does not change our previous opinion to deny ... benefits."  *Id*. at 3805-06.

**III.   Standard of Review**

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that is relevant to an element of a claim or defense and whose existence might affect

the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex,* 477 U.S. at 322, 324. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *See Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson,* 477 U.S. at 256. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in her favor. *See id.*

## IV.   Contentions of the Parties

Defendants contend:

> [R]egardless of whether the trier of fact ultimately determines that Barbour is entitled to receive disability benefits under her policy, it cannot be disputed that the information known to [Defendants] ..., created a genuine dispute as to whether she was entitled to benefits. And under well-established California law, the existence of that genuine dispute renders [Defendants]' denial of benefits reasonable as a matter of law and entitled it to partial summary judgment as to the bad faith claim.

ECF No. 23-1 at 7. Defendants contend that "the momentous 2009 surveillance video" "exposed Barbour's self-reported restrictions and limitations as inaccurate, if not patently false," and therefore "created a genuine dispute as to whether Barbour was totally disabled." ECF No. 35 at 5, 9. Defendants contend that "because [Defendants]' conduct was reasonable as a matter of law, Barbour cannot establish an essential element of her claim for intentional infliction of emotional distress—namely, 'extreme and outrageous conduct." ECF No. 23-1 at 7 n.2. Defendants contend that "even if triable issues existed as to whether [Defendants] acted in bad faith (and they do not), the total lack of any evidence of despicable conduct by [Defendants], much less evidence meeting the much higher standard of proof of 'clear and

convincing,' requires that Barbour's punitive damages claim be summarily adjudicated in favor

of [Defendants]." *Id.* at 7.

Plaintiff contends:

> Despite evidence indicating a lifelong disability with at least 5 prior unsuccessful surgical interventions, Defendants ... planned and then executed a cutoff of benefits of Plaintiff ... without regard for her continuing disability and knowingly leaving her without any other means of support. Defendants ... accomplished their goal by ignoring information favorable to Plaintiff ..., failing to abide by industry standards, regulatory requirements and legal obligations.

ECF No. 26 at 5.

## V.   Discussion

### A.   Covenant of Good Faith and Fair Dealing

Under California law, "[t]he covenant of good faith and fair dealing has 'particular application' to insurers because they are 'invested with a discretionary power affecting the rights of another,' and the insurance business is affected with a public interest and offers services of a quasi-public nature." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (applying California law) (quoting, inter alia, *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992); citing, inter alia, *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 820 (1979) (describing the duty of insurers to "take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements")). "Reflecting the importance of insurers' good faith obligations, bad faith by an insurer is subject to tort remedies, including punitive damages." *Id.* (citation omitted). "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (applying California law). "[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." *Amadeo*, 290 F.3d at 1161 (citations omitted).

Defendants contend that summary judgment is warranted as to Plaintiff's claim for breach of the covenant of good faith and fair dealing (also known as a "bad faith claim") by application of "the genuine issue as to coverage rule (also known as the genuine dispute doctrine)." *Guebara*, 237 F.3d at 992.

"The genuine issue rule in the context of bad faith claims allows a district court to grant

summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.  In such a case, because a bad faith claim can succeed only if the insurer's conduct was unreasonable, the insurer is entitled to judgment as a matter of law." *Amadeo*, 290 F.3d at 1161-62 (citation omitted).  "On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Id*. at 1162 (citation omitted).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants acted unreasonably in basing the decision to deny benefits in significant part on the 2007 surveillance of the wrong person.  Defendants' claim representative and investigator were each aware that "[Plaintiff] states that she uses a cane and her mother does everything for her."  Pl. Ex. 2 at 3159, ECF No. 26-4.  Video was taken in connection with the 2007 surveillance, and a photo of Plaintiff's mother appears on the investigator's written report as "the female subject believed to be the insured."  Pl. Ex. 2 at 2701-02, ECF No. 26-3.  A reasonable jury could conclude that Defendants acted unreasonably by failing to adequately investigate the identity of the subject of the 2007 surveillance.  *Cf. Egan*, 24 Cal. 3d at 819 ("Although we recognize that distinguishing fraudulent from legitimate claims may occasionally be difficult for insurers, especially in the context of disability policies, an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial.").  Viewing the evidence in the light most favorable to Plaintiff, Defendants' erroneous and unreasonable interpretation of the 2007 surveillance influenced the subsequent reports and actions of Defendants' claim representative (*see* Pl. Ex. 2 at 2767, ECF No. 26-3), Defendants' field representative (*see* Diegel Decl., Ex. 21 at 80-81, ECF No. 23-2), and Defendants' reviewing physicians (*see* Diegel Decl., Ex. 30 at 121-22, ECF No. 23-2 (Dr. Hammond); Diegel Decl., Ex. 33 at 137, ECF No. 23-2 (Dr. Benson)).

A reasonable jury could find that, on March 25, 2009, when Stoker called Plaintiff to

inform her that Defendants were terminating Plaintiffs' benefits, Plaintiff "directly told [Defendants] that information that [Defendants] claimed to have relied on about [Plaintiff] was incorrect (the 2007 surveillance of the wrong person)." Barbour Decl. ¶ 7, ECF No. 30-1. A jury could conclude that, after learning of the mistake in March 2009, Defendants unreasonably failed to take any action to reevaluate the decision to deny benefits until September 2009, when Plaintiff's attorney sent a letter to Defendants. Even after September 2009, Defendants did not reopen the file, request an independent medical evaluation, or ask Dr. Hammond whether knowledge of the mistake changed her opinion.[2] There is no indication in the record that Dr. Benson, Dr. Hammond or any other representative of Defendants considered a possible interpretation of the surveillance which *favored* Plaintiff: that over the course of five days of surveillance (three days in 2007 and two days in 2009), Plaintiff apparently left her residence on only one occasion, for less than 12 minutes, with a cane, walking a short distance. *Cf. Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996) ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim."). A reasonable jury could conclude that, upon being informed of Defendants' erroneous interpretation of the 2007 surveillance, Defendants unreasonably failed to adequately reevaluate the decision to deny benefits.

Viewing the facts in the light most favorable to Plaintiff, a jury could conclude that Defendants acted unreasonably in basing the decision to deny benefits in significant part on the 2009 surveillance video. A reasonable jury could find that most, if not all, of the activities performed by Plaintiff in the 2009 video were consistent with Dr. Smith's July 2008 statement that Plaintiff was able to sit, stand and walk less than one hour per day, and Plaintiff could "occasionally" lift up to ten pounds. Pl. Ex. 2 at 3378. ECF No. 26-4. A jury also could find that Defendants acted unreasonably in heavily relying on less than 12 minutes of surveillance

---

[2] Defendants informed Dr. Hammond of the statements in Plaintiff counsel's September 2009 letter, but the only question asked of Dr. Hammond—and the sole focus of her response—was: "Please advise if the [May 19, 2009 functional capacity evaluation] is reasonable and would reflect the claimant's long term status?" Pl. Ex. 2 at 3773, ECF No. 26-5.

video taken on a single day to support the conclusion that Plaintiff "has full time sedentary capacity." Diegel Decl., Ex. 30 at 122, ECF No. 23-2; *cf. Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 633 (9th Cir. 2009) (in ERISA action, agreeing with the district court that "signs of bias" on the part of the insurance company included that the company "overstates and over-relies on surveillance of Plaintiff" because the fact "that Plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he is capable of sustaining activity in a full-time occupation"); *Moore v. Am. United Life Ins. Co.*, 150 Cal. App. 3d 610, 626-27 (1984) ("Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or unconsequential details incident to the conduct of business.") (quotation omitted).

A bad faith claim may be supported by evidence of an "insurer's bias." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1010 (9th Cir. 2004) (citing *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 348 (2001)). Evidence of bias may be found when, in communication with the insured, an insurer "incorrectly state[s] that the policy [is] governed by ERISA." *Id.* at 1011 ("Substantial evidence was presented at trial that the jury could have relied upon in determining that Defendants engaged in a biased investigation.... [T]he termination letter incorrectly stated that the policy was governed by ERISA. If true, this would have meant that [plaintiff] had no available remedies under state law, including punitive damages."). In this case, Defendants erroneously indicated to Plaintiff in the termination letter that her claim was governed by ERISA. Diegel Decl., Ex. 36 at 148, ECF No. 23-2.

Under California law, "especially in the context of disability policies, an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Egan*, 24 Cal. 3d at 819. In the context of this case, a reasonable jury could find that Defendants' failure to seek an independent medical examination of Plaintiff supports Plaintiff's claim that Defendants acted unreasonably by failing to properly investigate Plaintiff's claim. *Compare id.* at 817 (affirming trial court's grant of a directed verdict in plaintiff's favor as to a bad faith claim on the basis that the insurer failed to properly

1  investigate its insured's claim because the insurer "fail[ed] to have plaintiff examined by a

2  doctor of [its] choice or to consult with plaintiff's treating physicians and surgeon"), *with*

3  *Phelps v. Provident Life & Accident Ins. Co.*, 60 F. Supp. 2d 1014, 1023 (C.D. Cal. 1999)

4  ("[W]hile it is true that failure to properly investigate a claim may give rise to a breach of the

5  covenant of good faith and fair dealing, this principle is not applicable in this case.... Here, it

6  is undisputed that Defendant had arranged for, and completed, an independent medical

7  examination."); *and Miller v. Allstate Ins. Co.*, No. CV-98-1974, 1998 WL 937400, at *6 (C.D.

8  Cal. Sept. 21, 1998) (granting summary judgment in favor of insurer as to bad faith,

9  distinguishing *Egan* because the insurer commissioned its own independent medical

10  examination of plaintiff).

11       Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could

12  conclude that Defendants acted unreasonably.  Accordingly, the Motion for Partial Summary

13  Judgment is denied as to Plaintiff's claim for breach of the covenant of good faith and fair

14  dealing.

15       **B.       Intentional Infliction of Emotional Distress**

16       "Under certain circumstances, a health care plan's conduct in handling a claim may

17  result in liability for intentional infliction of emotional distress."  *Hailey v. Cal. Physicians'*

18  *Serv.*, 158 Cal. App. 4th 452, 473 (2007) (citation omitted).  To prevail, a plaintiff must prove:

19  "(1) extreme and outrageous conduct by the defendant with the intention of causing, or

20  reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering

21  severe or extreme emotional distress; (3) and actual and proximate causation of the emotional

22  distress by the defendant's outrageous conduct."  *Cervantez v. J.C. Penney Co.*, 24 Cal. 3d

23  579, 593 (1979).

24       To prevail, "the conduct ... must be so extreme and outrageous as to go beyond all

25  possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

26  civilized community."  *Hailey*, 158 Cal. App. 4th at 474 (quotation omitted).  "Behavior may

27  be considered outrageous if a defendant (1) abuses a relation or position which gives him

28  power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries

through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Id*. (citations omitted).  "Moreover, the extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Id*. (quotation omitted).

In the context of the denial of disputed disability insurance claim, the California Court of Appeal has stated:

> Pointing out that its communications with plaintiff were polite and businesslike and contained no threats, accusations or false statements, defendant urges that it did nothing more than decline to pay a disputed claim relying upon the opinions of the reputable physicians to whom it sent plaintiff for examination and that this it was privileged to do.  That is one possible view of the evidence.  Viewing the evidence most favorably to plaintiff who prevailed below, however, reasonable inferences may be drawn that defendant purposely ignored the great bulk of the medical information it had and withheld that information from the physicians it selected to examine plaintiff and that it sought only to justify its predetermined course of discontinuing disability benefit payments justly due plaintiff under the policy....  [T]he jury was fully justified in impliedly finding defendant's conduct outrageous.

*Little v. Stuyvesant Life Ins. Co.*, 67 Cal. App.3d 451, 461-62 (1977) (citations omitted).

As discussed above, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants unreasonably terminated Plaintiff's disability benefits on the basis of the 2007 surveillance of a different person, and the 2009 surveillance showing Plaintiff engaging in activities largely, if not entirely, consistent with the restrictions and limitations identified in her treating physician's July 2008 statement.  Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find that, prior to March 25, 2009, Defendants acted with reckless disregard of those facts.  Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find that, between March 25, 2009 and late-September 2009, Defendants knew the decision to deny benefits was based in significant part on false information, yet Defendants did not resume payment of benefits or reopen the claim.  Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find Defendants' conduct to be outrageous.  Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find Defendants acted at least with reckless disregard of the probability of causing Plaintiff emotional distress.  *Cf. id.* at 462

("Viewing the evidence most favorably to plaintiff, the jury was ... fully justified in inferring that defendant acted with reckless disregard of the probability of causing plaintiff emotional distress. Given a person with plaintiff's medical problems, one would almost certainly expect a reduction in income from $615 per month to $208 per month to result in emotional distress as well as economic problems likely to result in more emotional distress.").

To prevail on her claim, Plaintiff must prove that Defendants' outrageous conduct caused Plaintiff to suffer "severe or extreme emotional distress." *Cervantez*, 24 Cal. 3d at 593. "Severe emotional distress means emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it. It may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Hailey*, 158 Cal. App. 4th at 476 (quotation omitted). "A plaintiff ... may recover for emotional distress alone without any resulting physical disability." *Id*. (citation omitted).

Stoker wrote in the claim file that on March 25, 2009, she informed Plaintiff on the phone that Defendants were discontinuing her benefits, and Plaintiff "became upset, crying and raising her voice that I was doing this to her, I was harassing her." Pl. Ex. 2 at 3719, ECF No. 26-5. Stoker stated that Plaintiff "began crying and stated that she is in constant pain from waist to feet. She took extra meds to meet with the field rep and to go to doctors." *Id*. Stoker wrote that Plaintiff "continued to repeat the same thing over and over again," and Stoker "continued to try and conclude the call but [Plaintiff] was not going to allow that," and Stoker eventually "wished her a good day and concluded the call." *Id*. at 3719-20.

In a declaration, Plaintiff states:

> On top of being in pain, , chronically ill and without any other resources, other than imposing on my family, I had to cater to Defendants' seemingly constant and often repetitive requests for proof of disability, proof of continuing treatment, proof of ineligibility for other income and otherwise.... I felt ignored, marginalized, dehumanized and, on occasion, harassed by their treatment of me and their lack of diligence and acceptance of my proof of continuing disability. As a result, I felt frustrated, angry, upset and anxious over the prospect of losing my disability benefits....

> On 3/25/09, Defendants (via Beth Stoker) called to tell me that they were terminating my benefits. I sacrificed my dignity in exchange for their reconsideration: I *begged* them to change their minds; I *begged* them to wait for

- 17 -

forthcoming information from Dr. Smith and I *begged* them to listen to my testimony of past and continuing disabilities and severe limiting pain and to consider it in keeping the claim open. I directly told them that information that they claimed to have relied on about me was incorrect (the 2007 surveillance of the wrong person). Nothing I could say or do would persuade them to change their minds. I cried during that telephone conversation. I sobbed uncontrollably immediately afterwards. After that, I remained in a state of shock for hours....

The disability checks stopped coming and I was without any personal means of support whatsoever.... My elderly mother now must support me. I am humiliated by having to create a burden on her. It saddens me that she is now paying for my expenses. I worry about what will happen to the both of us if she runs out of money because she is taking care of me.... I still constantly worry about my future and whether I will be able to pay my bills, cover my medical expenses, pay for prescriptions and afford the basics. My bouts of crying, anxiety, humiliation, depression, occasional problems with sleeping, sadness, frustration and above all—fear—from being deprived of my disability benefits continue to this day.

Barbour Decl. ¶¶ 4-5, 7-8, 11, ECF No. 30-1.

Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find that Defendants' outrageous conduct caused Plaintiff to suffer severe or extreme emotional distress. The Motion for Partial Summary Judgment is denied as to Plaintiff's claim for intentional infliction of emotional distress.

### C. Punitive Damages

"Punitive damages are available if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious." *Amadeo*, 290 F.3d at 1164 (citing, inter alia, Cal. Civ. Code § 3294(a)). "[T]he relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship." *Egan*, 24 Cal. 3d at 820 (citations omitted). "These considerations are particularly acute in disability insurance cases where the very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity." *Amadeo*, 290 F.3d at 1164 (quotation omitted). "Punitive damages are therefore made

available to discourage the perpetuation of objectionable corporate policies that breach the public's trust and sacrifice the interests of the vulnerable for commercial gain. Consistent with this goal, a plaintiff may meet the state of mind requirement for an award of punitive damages by showing that the insurer's bad faith was part of a conscious course of conduct, firmly grounded in established company policy." *Id*. at 1164-65. "'Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury.'" *Id*. at 1165 (quoting *Egan*, 24 Cal. 3d at 821).

As discussed above, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants acted in bad faith in terminating Plaintiff's benefits. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants' actions were "willful and rooted in established company practice." *Id*. at 1165 (quotation omitted); *cf. id*. ("Viewed most favorably to Amadeo, there is sufficient evidence that the denial of her claim was not simply the unfortunate result of poor judgment, but rather resulted from Principal's plainly unreasonable interpretation of its policy and the deliberate restriction of its investigation in a bad faith attempt to deny benefits due to Amadeo. Thus a jury might conclude that Principal's actions were willful and rooted in established company practice.") (quotations omitted). The Motion for Partial Summary Judgment is denied as to Plaintiff's request for punitive damages.

### D.    Evidentiary Objections

Any objections to evidence cited in this Order are overruled. Any objections to evidence not cited in this Order are denied as moot. Nothing in this Order constitutes a ruling on the admissibility of any evidence at trial.

### VI.  Conclusion

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment is DENIED. (ECF No. 23).

IT IS FURTHER ORDERED that all remaining dates in the Case Management Conference Order (ECF No. 17) are reset as follows.

The parties shall fully comply with the Pretrial Disclosure requirements of Federal Rule

of Civil Procedure 26(a)(3) on or before October 14, 2011.  Failure to comply with these disclosure requirements could result in evidence preclusion or other sanctions under Federal Rule of Civil Procedure 37.

Counsel shall meet together and take the action required by Local Rule 16.1(f)(4) on or before October 21, 2011.  At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements resulting in simplification of the triable issues.  Counsel shall exchange copies and/or display all exhibits other than those to be used for impeachment.  The exhibits shall be prepared in accordance with Local Rule 16.1(f)(4)(c). Counsel shall note any objections they have to any other parties' Pretrial Disclosures under Federal Rule of Civil Procedure 26(a)(3).  Counsel shall cooperate in the preparation of the proposed pretrial conference order.

The proposed final pretrial conference order, including objections to the opposing parties' Federal Rule of Civil Procedure 26(a)(3) Pretrial Disclosures shall be filed with the Clerk of the Court, and e-mailed to efile_hayes@casd.uscourts.gov in WordPerfect or Word format, on or before October 28, 2011, and shall be in the form prescribed in and in compliance with Local Rule 16.1(f)(6).

The final pretrial conference shall be held on November 4, 2011, at 11:00 a.m., in courtroom 4.

DATED:  August 15, 2011

*William Q. Hayes*

**WILLIAM Q. HAYES**
United States District Judge